[Cite as *In re R.P.*, 2025-Ohio-656.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

In re:  R.P. (DOB: 10/15/2014)     :     Case No.     24CA26

                                                     :     <u>DECISION AND</u>
                                                            <u>JUDGMENT ENTRY</u>
Adjudicated Dependent Child.     :

                                                     :     **RELEASED 2/21/2025**
_____
<u>APPEARANCES</u>:

Christopher Bazeley, Cincinnati, Ohio, for appellant.

Brittany E. Leach, Athens County Assistant Prosecutor, Athens, Ohio, for appellee.
_____
Hess, J.

{¶1}    The mother[1] of R.P. appeals a judgment of the Athens County Court of Common Pleas, Juvenile Division, granting legal custody of the child to the child's paternal aunt. Mother asserts two assignments of error: (1) the juvenile court's decision awarding legal custody to the paternal aunt is against the manifest weight of the evidence and (2) the juvenile court abused its discretion when it denied mother's motion for a continuance of the custody hearing. We find that the juvenile court did not abuse its discretion when it found that granting legal custody to the paternal aunt was in the child's best interest. We further find that the trial court did not abuse its discretion when it denied mother's request for a continuance of the legal custody hearing. Mother made the request minutes before the hearing was to begin and she did not request a specific time for the continuance or argue that she needed additional time to prepare. Rather she indicated she wanted more time to consider whether to stipulate to legal custody of the child being

_____
[1] The biological father is deceased.

granted to the paternal aunt. We overrule the assignments of error and affirm the juvenile court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶2} On November 29, 2023, the Athens County Children Services ("Agency") filed a complaint alleging that the child was neglected and dependent and requested it be granted temporary custody. The Agency alleged that the child had been previously adjudicated dependent due in part to the "deplorable conditions" of the home. The Agency alleged that the furnace was having issues, and the conditions of the home prevented service professionals from accessing the equipment. Additionally, the Agency alleged that the mother had physical disabilities that were affecting her ability to care for the child and had left the child with an inappropriate caregiver. Approximately a month later, the Agency amended its request and asked that the child be placed in the temporary custody of the paternal aunt. The juvenile court held a dispositional hearing on January 30, 2024, and, in accordance with an agreement reached between the Agency and mother, the Agency dismissed the allegation of neglect, and the juvenile court placed the child in the temporary custody of the paternal aunt. On June 24, 2024, the Agency filed a motion to modify the paternal aunt's temporary custody to legal custody. The juvenile court held a hearing on the legal custody motion on July 15, 2024.

{¶3} At the start of the hearing, mother moved for a continuance "so that we have more time to think about the ramifications of legal custody to [paternal aunt]" but otherwise made assurances that if "the court were to deny that we would, um, be prepared to move forward with the legal custody hearing today." The Agency opposed the continuance on the grounds that it would be in the best interest of the child that legal custody "not be

delayed." The Agency also argued that the paternal aunt was present for the hearing and having her "come to court over and over again, um, really impacts the familes['] lives." The Agency explained that it affects the paternal aunt's employment by having to take time off and to plan for the care, schooling, and transportation of the child while she attends court hearings. The juvenile court found the Agency's and paternal aunt's objections well-taken and denied the continuance.

{¶4}     Mary Timms, an employee with the Agency testified that she had been assigned to the family's case. Ms. Timms testified that the child, who was nine-years old at the time, has a number of medical conditions, and had been diagnosed with Down's Syndrome, Crone's disease, and sleep apnea. The child uses a CPAP machine, however, the mother had the CPAP machine and had not agreed to have it placed in the paternal aunt's home. The child is also on several different oral medications and is involved in the Ohio RISE program to assist with "some behavior health components." The child attends a day camp and is supposed to be wearing glasses and hearing aids, but the mother has not cooperated with the paternal aunt to ensure that the child has access to them. Ms. Timms testified that the child's glasses and hearing aids are "lost" in the mother's home and could not be found and the CPAP machine was initially with the paternal aunt, but was taken to the mother's home during an overnight visit and was not transported back to the aunt's home following the visit.  Ms. Timms testified that the paternal aunt has been ensuring that the child receives all of her medication and the necessary educational services.

{¶5}     Ms. Timms also testified that the child had not been supervised properly, and was experiencing poor hygiene and cleanliness issues. The Agency had worked with

mother to try to provide parenting mentoring services "on her level" but mother had experienced a "fall off of that service." Mother had a psychological assessment that revealed mental health and cognitive limitations. The Agency had concerns about mother's ability to parent due to "a mild intellectual ability." Mother also has Charcot-Marie-Tooth disease[2] that causes physical struggles that may exacerbate over time.  Ms. Timms also testified that mother's home "has been in deplorable conditions in the past" and the Agency provided a dumpster and cleaning supplies. Ms. Timms was last in mother's home in June, 2024 and "the home itself still had a good deal of clutter . . . some lingering urine scents." However, Ms. Timms was not able to inspect the second floor because mother had asked her not to because the former tenants had "done some more damage and destroyed some things." Ms. Timms testified that the home had showed some progress, but "the last time I was in the home, um, it wasn't in, um, the best condition that I've seen it."

{¶6}    Ms. Timms testified that the former tenants consisted of a woman, her partner, and her son and those tenants were "bringing significant safety concerns for when [the child] would come to visit the home."  The woman was "quite verbally abusive" and the woman's son "had been inappropriate in the home, and had removed his genitals from his clothing in front of [the child]."  Ms. Timms testified that although the tenants had been evicted, there was an individual sleeping in a bedroom during Ms. Timms' visit. Ms.

---

[2] Charcot-Marie-Tooth disease (CMT) "is one of a group of disorders that cause damage to the peripheral nerves—the nerves that transmit information and signals from the brain and spinal cord to and from the rest of the body, as well as sensory information such as touch, back to the spinal cord and brain."  CMT symptoms include progressive muscle weakness, foot deformities such as hammertoes, sensory loss, and a high-stepped gait with frequent tripping or falling. https://www.ninds.nih.gov/health-information/disorders/charcot-marie-tooth-disease (Accessed February 13, 2025)  https://perma.cc/P3U5-34NB

Timms testified that this is the second time that the child had been adjudicated dependent with the same or similar issues that the Agency was seeing in this case.

{¶7}   Ms. Timms testified that during a recent visit the child had with mother, the child had fallen while trying to climb on top of the refrigerator and received a large, deep gash on her head. However, by the time the paternal aunt had been informed of the injury, it was too late for the child to receive stiches, which Ms. Timms believes "she would have benefited from." Ms. Timms has observed the child and the paternal aunt interact on multiple occasions and they are very well bonded. The child listens very well to the aunt and seeks comfort from her if she becomes upset.

{¶8}   Ms. Timms testified that the child has made much progress in the paternal aunt's care. The paternal aunt has provided "an incredibly supportive environment" and has "facilitated as much family connection as she possibly can."  Ms. Timms testified that the paternal aunt "is very well equipped to provide care for this child."

{¶9}   Mother did not testify or present witness testimony but asked the juvenile court to incorporate the testimony presented at the dispositional hearing held earlier on January 30, 2024. The juvenile court announced that it would take the matter under advisement so that the court could review that testimony.

{¶10}  At the January 30, 2024 dispositional hearing, the Agency presented the testimony of seven witnesses. An Agency school outreach caseworker testified that she had worked with the family and the child for approximately four years. This caseworker described the efforts she had taken to assist the family and the level of filth and insect infestations in the home. An Agency family services supervisor testified that she supervises Ms. Timms, has completed home visits with the family, and has an extensive

history with the family. The family services supervisor testified that the family has had as many as 15 dogs living in the home at one time and that animals have been removed from the home only to have more reappear. Photographs of the mother's home were introduced into evidence, which depicted enormous amounts of clutter throughout. Several service and support administrators with the Athens County Board of Developmental Disabilities testified that they are case managers for the child and the mother. Mother receives assistance because of her Charcot-Marie-Tooth disease, which limits her mobility. An employee with Integrated Services testified that she had been working as a "light weight case management" worker for the family and assists with food, transportation to medical appointments, and speech skills. The paternal aunt testified about her understanding and agreement with legal custody, and she refuted an allegation that her partner had slapped the child once in the past, approximately seven years earlier, during a trip to the grocery store. A representative from CASA recommended that the paternal aunt be given temporary custody until further review. The various witnesses at the dispositional hearing testified consistently about the state of the home, including the problems with clutter, dog and cat feces, bedbug and cockroach infestations, various unsavory individuals coming and going, and challenges with heating and plumbing issues. A few witnesses also testified about the hygiene and cleanliness issues and developmental delays or regression the child experienced while in mother's care. Witnesses who were asked their recommendation at that stage of the proceedings unanimously advised that the court award temporary custody to the paternal aunt.

{¶11} Following the July 15, 2024 hearing to modify temporary custody to legal custody and the juvenile court's review of the testimony from the January 30, 2024

disposition hearing summarized above, the juvenile court granted the paternal aunt legal custody.

## II.  ASSIGNMENTS OF ERROR

**{¶12}**  Mother presents the following two assignments of error:

The trial court's decision awarding legal custody to [paternal aunt] is against the weight of the evidence.

The trial court abused its discretion when it denied [mother's] motion for a continuance.[3]

## III.  LAW AND ANALYSIS

### A.  Legal Custody Award

#### 1. Standard of Review

**{¶23}**  After a trial court adjudicates a child abused, neglected, or dependent, R.C. 2151.353(A)(3) authorizes the court to award legal custody of the child to any other person who is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings.

**{¶24}**  "Legal custody" is defined in R.C. 2151.011(B)(21) and means "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities."

---

[3] The second assignment of error was stated as "The trial court's decision __ parental rights is against the weight of the evidence" on page "i" of the brief. Because the argument addresses the request for a continuance, we address this version of the second assignment of error.

{¶25} Legal custody "is not as drastic a remedy as permanent custody because a parent retains residual rights and has the opportunity to request the return of the children." *In re Memic,* 2006-Ohio-6346, ¶ 24 (11th Dist.). To award legal custody of an abused, neglected, or dependent child, a trial court must find, by a preponderance of the evidence, that legal custody is in the child's best interest. *Matter of W.W.*, 2024-Ohio-878, ¶ 29 (4th Dist.). "A 'preponderance of the evidence' is 'evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re B.P.*, 2010-Ohio-6458, ¶ 43 (4th Dist.), quoting *Black's Law Dictionary* 1182 (6th Ed.1998).

{¶26} The child's best interest is the controlling principle in determining whether to award a parent or other person legal custody, however R.C. 2151.353(A)(3) does not list any factors that guide the best interest determination. Ohio appellate courts have not agreed on a single best interest test that a trial court must apply when considering a R.C. 2151.353(A)(3) legal custody award. Instead, courts have applied the best interest factors listed in R.C. 3109.04 or R.C. 2151.414, a combination of the two, or a general best interest test. *See Matter of W.W.*, 2024-Ohio-878, ¶ 30 (4th Dist.) and cases cited therein. Here the juvenile court recognized that it could consider the best interest factors in R.C. 3109.04, but determined "it is not required nor is it needed in the Court's determination." The juvenile court instead considered the best interest factors contained in R.C. 2151.414(D)(1). Thus, we use this same statute when reviewing mother's first assignment of error.

{¶27} We apply an abuse of discretion standard to our view of the juvenile court's legal custody determinations because "a trial court must find, by a preponderance of the evidence, that legal custody to the parent or other person is in the child's best interest."

*Matter of W.W.,* 2024-Ohio-878, ¶ 29 (4th Dist.), citing *In re K.L.V.W.*, 2023-Ohio-1287, ¶ 28, ¶ 30 (8th Dist.). This differs from the "clear and convincing evidence" in the permanent custody statute, R.C. 2151.414. *See In re Z.C.* 2023-Ohio-4703, ¶ 11 ("Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree . . . that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination); *Matter of B.S.,* 2024-Ohio-5183, ¶ 38 (4th Dist.) ("This court . . . does not apply an abuse-of-discretion standard to review permanent custody judgments."); *Matter of W.W.*, 2024-Ohio-878, ¶ 23, 26 (4th Dist.) (we apply an abuse of discretion standard when reviewing child custody matters that do not involve the termination of parental rights); *Matter of J.C.*, 2024-Ohio-1505, ¶ 29 (5th Dist.) ("We review the trial court's award of legal custody for an abuse of discretion and recognize that a trial court has broad discretion in proceedings involving the care and custody of children.").

## 2. Statutory Framework

{¶28} The juvenile court reviewed the best interest factors in R.C. 2151.414(D)(1), which state:

> In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies

* * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

### a. The Interaction and Interrelationship of the Child

{¶29} The mother argues that she loves her child and, thus, this factor is in her favor. The juvenile court found that there was "no doubt that Mother loves her child." However, it also found that "mother is easily overwhelmed with the daily activities as a parent" and "overwhelmed by even the services offered" to help with parenting. It found that the child "is bonded with" the paternal aunt and is doing well physically and making educational progress. The juvenile court found, "The relationship with the minor child and the [paternal aunt] has been extremely important and necessary in the child's growth as the child is safe and stable."

{¶30} The evidence supports the juvenile court's determination of this factor. Witnesses testified consistently that the mother struggles to parent the child appropriately and that the child and paternal aunt have had a long-term, healthy, safe, and caring relationship. There was also testimony that the paternal aunt and child have a strong bond and the child listens to and seeks comfort from the paternal aunt

### b. Wishes of the Child

{¶31} The child has Downs Syndrome and was nine years old at the time of the hearing. The juvenile court found that it was unable to determine the child's wishes.

Mother does not contest this factor and agrees that the child was unable to express wishes.

### c. Custodial History

**{¶32}** The juvenile court found that the child had been in the temporary custody of the paternal aunt for over six months at the time of the hearing – since January 30, 2024 – and has "thrived." The court found that the mother had not made sufficient progress on her case plan and has "not made enough progress to even warrant unsupervised visitation or extended visitation with the child."

**{¶33}** Mother argues that this factor "falls decisively" in her favor because the child had only been in the temporary custody of the paternal aunt for six months and mother should have been given a continuance "for additional time" but was denied it. However, mother fails to explain how not having custody of her child for over six months and not progressing to unsupervised visitation during that entire period causes this factor to fall "decisively in [mother's] favor."

**{¶34}** The evidence supports the trial court's analysis of this factor. The child has had one prior dispositional hearing as the mother has had a long-term problem providing a safe and clean home. Witnesses testified that the mother has struggled for years to create a clean, safe home environment and that she makes some progress but then regresses. However, the child has thrived under the custodial care of the paternal aunt. There was testimony that when the mother had unsupervised overnight visitation with the child, the child fell and suffered a large gash on her head, for which the mother failed to seek appropriate medical attention.

d. Legally Secure Permanent Placement

**{¶35}** The Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶36}** The juvenile court found that a secure and permanent placement can only be accomplished by granting legal custody to the paternal aunt because she "is the only suitable individual to provide a safe and stable environment that allows the child to thrive." More specifically, when addressing this factor, the juvenile court found:

> The child requires significant attention due to her medical concerns. Mother was not able to provide the necessary care and comfort to ensure that those medical concerns were being met. The [paternal aunt] has demonstrated that she can provide such care and support for the minor child. Mother has limitations that are likely to prevent her from being able to appropriately provide for the needs of the child. These limitations and/or barriers are unlikely to be resolved even with support and services to the Mother in the future. This will likely lead to a high risk of the child being either neglected or dependent in the future. Mother has not demonstrated substantial compliance or progress with the case plan. The issues that remained at the beginning of this case are still present at the conclusion.

**{¶37}** Mother argues that this factor falls in her favor because she owns her own home and agreed to be placed on the Athens County Housing Authority's waiting list. And even though there were concerns initially about the mother's home and the "inappropriate people" living there, there was testimony that conditions of the home had improved and tenants had been evicted.

**{¶38}** The evidence supports the juvenile court's finding that a legally secure permanent placement could not be achieved without a grant of legal custody to the paternal aunt. This factor was testified about by all the witnesses in detail and their testimony overwhelmingly supports the juvenile court's finding that the mother cannot, even with the high level of support she has received from various agencies, provide a secure and permanent home for her child.

e.  Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶39}** The juvenile court found that R.C. 2151.414(E)(7) to (E)(11) were not applicable.  Mother does not contest this.

**{¶40}**  After reviewing the evidence, we find that the juvenile court did not abuse its discretion when it awarded legal custody of the child to the paternal aunt.  The Agency presented a preponderance of the evidence upon which the court reasonably could have determined that a grant of legal custody to the paternal aunt was in the best interest of the child. We overrule mother's first assignment of error.

B. Mother's Request for Continuance

**{¶41}**  Mother contends that the trial court abused its discretion when it denied her request for a continuance of the legal custody hearing because she needed more time to determine whether to contest the legal custody motion. She contends that she was prejudiced because she was prevented from fully considering and preparing for the motion.

**{¶42}**  A trial court has broad discretion to determine whether to grant a continuance. *State v. Conway*, 2006-Ohio-791, ¶ 147, citing *State v. Unger*, 67 Ohio St.2d 65 (1981), syllabus. We reverse a trial court's decision denying a continuance only if the

trial court abused its discretion. *State v. Jones*, 91 Ohio St.3d 335, 342 (2001). An abuse of discretion is an "unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken." *State v. Brady,* 2008-Ohio-4493, ¶ 23.

{¶43} An appellate court employs a balancing approach to determine whether the trial court abused its discretion when it denied a continuance. *In re Ca.S.*, 2021-Ohio-3874, ¶ 33 (4th Dist.). In exercising discretion, a trial court should weigh any prejudice suffered by the party seeking the continuance against the court's right to control its docket and provide prompt, efficient justice to the public. *Id.*

> A court should also consider: (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to litigants, witnesses, opposing counsel[,] and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and (6) other relevant factors, depending on the unique circumstances of the case.

(Citation omitted.) *Id.* The balancing test is applied on a case-by-case basis and the appellant must show how the denial of the continuance resulted in prejudice. *Id.* at ¶ 34; *Matter of D.H.*, 2023-Ohio-2368, ¶ 11-13 (4th Dist.). Juv.R. 23 allows for continuances, "only when imperative to secure fair treatment for the parties."

{¶44} We find that the juvenile court's decision to deny mother's motion for a continuance was not unreasonable, arbitrary, or unconscionable. Mother sought an indefinite continuance to determine whether she would stipulate to the Agency's motion to grant legal custody to the paternal aunt. She did not argue that she was unprepared, could not procure the attendance of witnesses, or needed additional time to respond. To the contrary, mother's attorney stated that they were prepared to move forward with the

hearing that day should the court deny the continuance. Moreover, the record shows that the Agency filed its motion on June 24, 2024 and the hearing was not held until July 15, 2024. Thus, at the time she sought a continuance, Mother already had three weeks to consider the Agency's motion and, because the paternal aunt had temporary custody, mother had over six months to observe her child's adaptation to the paternal aunt's care. Mother did not identify what additional information she hoped to gain during the continuance that would assist her decision-making. A continuance would have inconvenienced the court, the Agency, its witnesses, and the paternal aunt as they were present in the courtroom and prepared to proceed that day. We find that the juvenile court did not abuse its discretion when it denied mother's motion for a continuance. We overrule the second assignment of error.

## IV. CONCLUSION

{¶45} We conclude that the juvenile court did not abuse its discretion in granting legal custody to the paternal aunt or in denying mother's request for a continuance. We overrule the assignments of error and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
      Michael D. Hess, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**